_____

XEROX CORPORATION, a New York Corporation,

Plaintiff,

-vs-

ARIZONA DIGITAL PRODUCTS, INC.,

Defendant.

DECISION AND ORDER
08-CV-6480 (CJS)

_____

## APPEARANCES

For Plaintiff:                        Carolyn G. Nussbaum, Esq.
                                      Nixon Peabody LLP
                                      1100 Clinton Square
                                      Rochester, New York 14604

For Defendant:                        Mary Jo S. Korona, Esq.
                                      Steven E. Cole, Esq.
                                      Leclair Korona Giordano Cole LLP
                                      39 State Street, Suite 500
                                      Rochester, New York 14614

## INTRODUCTION

In this action, Xerox Corporation ("Plaintiff") is suing its former authorized sales agent, Arizona Digital Products, Inc. ("Defendant") for breach of contract, conversion, trademark infringement, trademark dilution, and unfair competition. Now before the Court is Defendant's motion to dismiss this action, or alternatively, to transfer venue. (Docket No. [#4]). For the reasons that follow, the application is granted in part and denied in part.

1

BACKGROUND

Unless otherwise noted the following facts are taken from Plaintiffs' Complaint and from affidavits submitted in connection with the subject motion. Plaintiff manufactures a wide variety of products, including copiers, printers, and supplies. Plaintiff is a New York corporation with its principal place of business in Connecticut, and with offices around the world, including in Rochester, New York.  Plaintiff is a Fortune 500 company with over fifty-thousand employees.

Defendant provides copier and printer services to businesses in the vicinity of Phoenix, Arizona.  Defendant is an Arizona corporation with its sole place of business in Scottsdale, Arizona. Defendant is a small business with seven employees, two of whom account for over ninety percent of Defendant's sales revenue.

In 2002 the parties entered into a Business Relationship Agreement ("the Agreement") and a Sales Agent Schedule ("the Schedule").  The Agreement established Defendant as an authorized dealer of Plaintiff's products in a designated "Dealer Territory," specified as the Arizona Counties of Maricopa and Pinal.[1]  The Agreement further stated that Defendant would have a single authorized business location, in Scottsdale, Arizona.  The Schedule authorized Defendant to service Plaintiff's equipment in a specific territory consisting of the Arizona Counties of Cochise, Gila, Graham, Greenlee, La Paz, Maricopa, Pima, Pinal, Santa Cruz, and Yuma.  Under the Agreement and the Schedule, Defendant became an authorized Xerox Sales Agent for Maricopa County, Arizona.  As a sales agent, Defendant was authorized to sell and

---

[1]Plaintiff has "approximately 327 Sales Agents in the United States who operate approximately 460 different Sales Agent territories covering all 50 states and Puerto Rico." (Eychner Affidavit ¶ 7).

lease Plaintiff's products to third-party customers in the aforementioned territory. Defendant was not permitted to solicit business outside the territory.

The Agreement specified that Defendant was required to "pay all amounts owed to Xerox as they become due, whether these payments are owed pursuant to this Agreement or any other transaction between the parties." (Agreement § 5.4). The Agreement also described Defendant's right to market "Products," defined as "products marketed by Xerox that Business Associate is authorized to market under the Schedules." (Agreement § 1.2). The Agreement stated that Defendant had "no distribution or other right to any Xerox-marketed products, accessories, or supplies, either presently available or that become available, other than the Products." *Id*. § 2.5. The Agreement further provided that if it was terminated, Defendant was required to "return to Xerox in a commercially reasonable manner all associated Xerox property and materials . . . in its possession or control." *Id*. § 6.8.

The Agreement further contained provisions regarding the use of the Xerox name and trademark. In relevant part, the Agreement prohibited Defendant from using the Xerox name "in any manner that is inconsistent with Business Associate's true status or which may be misleading to End Users," and stated that Defendant's permission to use Xerox's trademark would "terminate upon the expiration or termination of [the] Agreement." *Id*. § § 3.1, 3.3.1.

The Agreement also contained an arbitration clause that states, in relevant part, "[i]n the event the parties are unable to informally resolve a Covered Dispute, they hereby agree that it will be decided through arbitration as the sole and exclusive remedy for resolving such Covered Dispute." (Agreement § 7.3). In that regard,

"Covered Disputes" were defined as

> any and all claims, actions, and suits other than the excepted disputes listed below arising out of or in any way relating to this Agreement or any previous Business Relationship, Authorized Sales Agent, or Authorized Dealer Agreements between the parties, regardless of whether the claim alleges or is based upon tortious conduct (including negligence) or any other theory at law or in equity ("Covered Disputes"). By way of example, and not restriction, Covered Disputes shall expressly include (a) any matters in which one party names one or more employees of the other as individual defendants . . . and (b) any matters arising out of or related to the undertaking, breach, non-renewal, or termination of this Agreement or any previous Business Relationship, Authorized Sales Agent, or Authorized Dealer Agreements between the parties. The only disputes that shall be excepted from this limitation . . . are disputes regarding: (a) liabilities to third parties arising out of indemnified matters; (b) transactions involving the acquisition of products and/or services by Business Associate from Xerox; and (c) the use or retention of either party's intellectual property or confidential, proprietary, or sensitive information.

(Agreement § 7.2.1). And finally, the Agreement contains a New York State choice-of-law provision. *Id*. § 8.8.

The Schedule likewise contains certain provisions that relate to the instant dispute. First, the Schedule states that

> Xerox shall provide to Agent, at no charge, such demonstration equipment as Xerox deems reasonably necessary and shall maintain such equipment in good working order. . . . Demonstration units are the property of Xerox and shall be returned to Xerox upon request. Agent shall use such units exclusively for End User demonstration purposes in accordance with guidelines published by Xerox.

(Schedule § 2.4-2.4.1). The Schedule also contains a "dispute resolution" provision, which refers to the Agreement's arbitration clause, Section 7.3, as being "required." (Schedule § 4.1).

Defendant negotiated the Agreement and Schedule with Plaintiff at a meeting held in Phoenix, Arizona. On September 18, 2002, Defendant's President, Judd

Roland ("Roland"), signed the Agreement and Schedule in Arizona. On September 30, 2002, Plaintiff, by its Business Development Manager, Kelly Gervasi ("Gervasi"), signed the Agreement and Schedule in Arizona.

On or about October 11, 2002, the parties executed an Authorized Dealer Schedule ("the Dealer Schedule"). (Cole Declaration, Exhibit B). The Dealer Schedule established Defendant as "a non-exclusive, authorized reseller for the promotion, sale, and installation of" Xerox's products in the Arizona Counties of Cochise, Gila, Graham, Greenlee, La Paz, Maricopa, Pima, Pinal, Santa Cruz, and Yuma. The Dealer Schedule was signed on behalf of Defendant by Roland, in Arizona. The Dealer Schedule was signed on behalf of Plaintiff by Kenneth E. Sarvis ("Sarvis"), Director of Business Operations, who, "upon information and belief," was physically located in Rochester, New York, at the time. (Eychner Aff. ¶ 13).

Effective January 1, 2006, the parties entered into an Amended Business Relationship Agreement ("the Amended Agreement"). The Amended Agreement provided that upon termination of the agreement, Defendant was required to either disconnect its business telephone lines or add a message "providing callers with the new telephone numbers to reach their new local Xerox representative." (Amended Agreement § 1(A)). Otherwise, the Amended Agreement was essentially identical to the original Agreement in all material respects. The Amended Agreement was signed on behalf of Plaintiff by Gary Bishop, in California, and on behalf of Defendant by Roland, in Arizona.

The parties' business relationship continued for approximately six years. According to Plaintiff, "significant aspects" of the relationship were "managed from or by

Xerox employees in Rochester, New York." (Eychner Affidavit ¶ 3). In that regard, a branch of Plaintiff's business known as the North American Agent Operations ("NAAO") oversaw Sales Agents and Authorized Dealers, including Defendant. *Id*. at ¶ 8. The NAAO was headquartered in Rochester. Defendant dealt directly primarily with NAAO "regional representatives," who were located outside of New York State. However, those regional representatives were subject to "direct or indirect supervision at times" by supervisors in Rochester, New York. *Id*. at ¶ 12. Plaintiff maintains that all form agreements were drafted in Rochester, New York, and had to be approved by supervisors in Rochester. Plaintiff further states that supervisors and other staff in Rochester determined Defendant's sales quotas, processed orders placed by Defendant, provided technical support, and remitted payments to Defendant.

Defendant, however, maintains that it dealt primarily with Xerox representatives in the Western U.S., not Rochester. In that regard, Defendant states that various business documents, such as an "Agent Analyst Addendum" and "Territory Amendment" were handled by Xerox employees in Arizona and California, respectively. (Roland Reply Aff. ¶ ¶ 2-4). Defendant further states that it received various types of assistance, including training support, equipment support, and sales assistance from Xerox employees in California, Arizona, Texas, Indiana, and Washington. *Id*. ¶ ¶ 5, 8-11. Defendant did receive email messages from Xerox personnel in New York, although such messages always included language advising Defendant to direct any questions to "Western region personnel." *Id*. at ¶ 6. Defendant maintains that the agreements it signed with Plaintiff were signed in Arizona, and Defendant was not

aware that the agreements would later be sent to New York. *Id*. at ¶ 13.  Plaintiff further

states that it received monthly commission statements from an on-line source, which

did not indicate that it originated in New York. *Id*. at ¶ 20.  Additionally, Plaintiff indicates

that it received agent payments by wire transfer to its bank account, and that such wire

transfers did not indicate that they originated in New York. *Id*. at ¶ 21.

On June 26, 2008, Plaintiff terminated the Amended Agreement.  The

termination notice explained that Plaintiff was terminating the parties' business

relationship because Defendant had breached the Amended Agreement in two

respects.  First, Plaintiff stated that Defendant was in breach of Section 2.4.1 of the

Amended Agreement, because it was using Plaintiff's demo copier to run a print shop.[2]

Second, Plaintiff stated that Defendant was in breach of Section 5.1 of the Amended

Agreement, by engaging in unethical and dishonest acts, and specifically, by stealing

Plaintiff's supplies. *Id*.[3]  The termination notice was signed by "Scott A. Sanders,

Regional Sales Manager, NAAO Western Region." (Complaint,  Exhibit G).

On June 26, 2008, Plaintiff provided Defendant with a memo, entitled

"Compliance with Contract Requirements."[4] (Complaint, Exhibit I, Attachment).  The

memo purported to remind Defendant of "some of [the] most significant obligations"

under the Amended Agreement, in light of the termination of that contract.  The memo

---

[2] "Xerox has learned that ADP operates a print for pay business at ADP's location.  As of June 23, 2008, over 200,000 prints have been made on the Demo Unit." (Complaint, Exhibit G at 2).

[3] Plaintiff alleges that, pursuant to certain agreements that it had with third-party customers, whom Defendant serviced, the customers had in their possession certain supplies that still technically belonged to Plaintiff until used, which Plaintiff would replace once used.  According to Plaintiff, Defendant took the supplies and either used them or sold them, knowing that Plaintiff would provide new supplies to the customers.

[4] The memo actually bears the date June 26, *2007*, however the 2007 date appears to by a typo.

directed Defendant to do the following: 1) protect Xerox's confidential information; 2) return all Xerox property and materials; 3) cease using Xerox's trademarks, logos, tradenames and slogans; 4) cease referring to itself as an authorized Xerox representative; and 5) either change or disconnect its business telephone lines or add a message providing callers with a new telephone number to reach the new local Xerox representative. *Id*.

On July 25, 2008, Plaintiff sent Defendant a "cease and desist" letter (Complaint, Exhibit I), which stated that Defendant was in breach of the Amended Agreement in several respects. First, the letter stated that Defendant was in violation of Section 3.1 of the Amended Agreement, by continuing to refer to itself as an authorized Xerox sales agent on its website. In that regard, the letter stated, in relevant part: "The continued use of the XEROX name and trademark on your signage and website violates the terms of the [Amended Agreement]. The XEROX name and mark are valuable intellectual property assets owned by Xerox[.]" *Id*. at 1. Further, the letter stated that Defendant was in breach of Section 6.8 of the Amended Agreement, since Defendant was continuing to use "confidential information and Xerox property," including software, customer lists, and promotional literature. *Id*. at 2. Lastly, the letter stated that Defendant was violating the Amended Agreement by refusing to either disconnect its business telephone lines or add a message providing callers with the new telephone number to reach the new local Xerox representative. *Id*. at 3.

On October 24, 2008, Plaintiff commenced this action, alleging claims for breach of contract, conversion, unfair competition, trademark infringement, and trademark

dilution.  The Complaint alleges that Defendant breached Section 5.4 of the Amended Agreement by failing to pay invoices for goods purchased from Plaintiff between April 2008 and July 2008. (Complaint ¶ ¶ 17-21).  The Complaint further alleges that Defendant breached Section 2.4.1 of the Amended Agreement, and committed the tort of conversion, by using Plaintiff's demo copier to run a commercial print shop. (Complaint ¶ ¶ 30-37).  Additionally, the Complaint alleges that Defendant converted Plaintiff's property, namely copier supplies, by taking the unpaid-for supplies from customers whom Defendant had "serviced as an authorized Xerox Sales Agent," and either selling them or using them in Defendant's print shop. (Complaint ¶ 38).  The Complaint also alleges that Defendant breached its "trademark obligations under the [Amended Agreement]," and committed trademark infringement, trademark dilution, and unfair competition, by continuing to use the same telephone number as before, by identifying itself as a Xerox "partner" on its website, and by continuing to use the Xerox name.  In that regard, the Complaint alleges, in relevant part, that Defendant's "obligations with respect to the Xerox Marks under its [Amended Agreement] survived termination of the [Amended Agreement]." (Complaint ¶ 87).

The Complaint states that this Court has both diversity subject-matter jurisdiction and federal question subject-matter jurisdiction.  The Complaint also states that venue in this Court is proper pursuant to 28 U.S.C. § 1391 "because [Defendant] is subject to personal jurisdiction in this District." (Complaint ¶ 57).  The Complaint further states that Defendant is subject to personal jurisdiction in this judicial district since it "transacted business in Rochester, New York," since Defendant committed a tortious act outside of the state that injured Plaintiff in Rochester, Defendant reasonably should have

expected the tortious act to have consequences in New York , and since Defendant derives substantial revenue from interstate or international commerce. *Id*. at ¶ ¶ 58-59. With regard to Defendant's contacts with the State of New York, the Complaint alleges, *inter alia*, that Defendant entered into the Agreements and the Schedule "in Rochester, New York." *Id*. at ¶ ¶ 3, 4 & 7.

On December 15, 2008, Defendant filed the subject motion to dismiss or transfer venue. Defendant maintains that: 1) the Court lacks personal jurisdiction over Defendant; 2) the Court lacks subject-matter jurisdiction over some of Plaintiff's claims, specifically, those aspects of the dispute that are covered by the Agreement's arbitration clause; 3) venue in this District, or any district in New York, is improper; and 4) alternatively, this District is an inconvenient forum, and venue should be transferred to the District of Arizona for the conveniences of the parties. Defendant further maintains that the Court should award Defendant costs and attorney's fees in connection with the defense of claims that are covered by the arbitration clause. Plaintiff opposes all aspects of the motion.

On June 11, 2009, counsel for the parties appeared before the undersigned for oral argument.

DISCUSSION

*The Arbitration Clause*

At the outset, the Court will consider the applicability of the Agreement's arbitration clause. Both parties to this action discuss the arbitration clause in terms of the Court's subject-matter jurisdiction. However, "[t]he right to arbitrate is an affirmative

defense," that can be waived, *Brookridge Funding Corp. v. Northwestern Human Resources, Inc.*, 170 Fed.Appx. 170, 171 (2d Cir. Mar. 2, 2006) (*citing Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir. 1993)), while subject-matter jurisdiction "can never be forfeited or waived." *Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2d Cir. 2008) (*quoting Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514, 126 S.Ct. 1235 (2006)). The relevant legal principles applicable to arbitration clauses are clear:

> Although parties may be required to arbitrate only when they have agreed to do so ... there is an emphatic federal policy in favor of arbitral dispute resolution. As a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.] Arbitration must be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.

> The Second Circuit has adopted a two-step process for determining whether an arbitration clause governs a dispute when there are no federal statutory claims advanced. First, a court should classify the particular clause as either broad or narrow. The use of the language 'arising out of or relating to' in the arbitration clause falls into the broad classification. Second, when interpreting a narrow arbitration clause, the court must decide if the claim involves an issue that is on its face within the purview of the clause or is a collateral issue. In most cases, narrow clauses do not apply to collateral issues. When interpreting a broad clause, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Kelso Enterprises Ltd. v. M/V DIADEMA*, No. 08 Civ. 8226(SAS), 2009 WL 1788110 at *2 (S.D.N.Y. Jun. 23, 2009) (footnotes and internal quotation marks omitted). When federal statutory claims are covered by an arbitration clause, they are "subject to arbitration unless Congress manifests an intent to the contrary." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F.Supp.2d 420, 427 n. 2 (S.D.N.Y. 1998) (finding that

Lanham Act claims are arbitrable) (citations omitted).

Here, Defendant contends that "some or all" of Plaintiff's claims are covered by the arbitration clause. (Def. Memo of Law [#4-9] at 7). Specifically, Defendant maintains that the breach of contract and conversion claims are covered, and that the unfair competition claim may be covered. *See, Id.* at 9 ("Xerox was required to arbitrate any claim for breach of contract and conversion, and possibly its unfair competition claim."). Defendant does not claim that the trademark infringement and dilution claims must be arbitrated. Plaintiff, meanwhile, contends that all of its claims "fall outside the scope of the arbitration clause, as they relate to ADP's obligations arising from separately executed invoices, disputes regarding ADP's wrongful acquisition and subsequent conversion of Xerox products, and intellectual property disputes." (Pl. Memo of Law at 20). Specifically with regard to the first cause of action for breach of contract, Plaintiff states that,

> Xerox's First Cause of Action relates to ADP's failure to pay for products it acquired from Xerox. ADP's duties with respect to this claim arise solely from the invoices for each transaction, which reflect ADP's promise to pay for goods purchased. Evaluation of this claim does not require any reference to [the Agreement], and could be asserted even if [the Agreement] had never been executed.

*Id*. At 21.[5]

Applying the foregoing principles of law to the facts of this case, the Court finds that the subject arbitration clause is broad, inasmuch as it covers "any and all claims,

---

[5]Although Plaintiff now maintains that the claim does not require any reference to the Agreement, the fact is that the Complaint referred to the Agreement. As mentioned above, the Complaint states that Defendant's failure to pay invoices for goods purchased from Plaintiff between April 2008 and July 2008 breached paragraph 5.4 of the Agreement. (Complaint ¶ ¶ 17-21).

actions, and suits other than the excepted disputes listed below arising out of or in any way relating to this Agreement or any previous Business Relationship, Authorized Sales Agent, or Authorized Dealer Agreements between the parties, regardless of whether the claim alleges or is based upon tortious conduct (including negligence) or any other theory at law or in equity[.]"  All of Plaintiff's claims arise from, or are related to the Agreement.  Accordingly, all of Plaintiff's claims are subject to arbitration, unless they are specifically excepted by the Agreement.  In that regard, the Agreement excludes, in relevant part, "transactions involving the acquisition of products and/or services by Business Associate from Xerox," and claims involving "the use or retention of either party's intellectual property or confidential, proprietary, or sensitive information." (Agreement § 7.2.1).

Therefore, the Court agrees with Plaintiff that the first cause of action, seeking payment for supplies ordered by Defendant, is covered by the exception for "transactions involving the acquisition of products and/or services by Business Associate from Xerox."  Moreover, the Court agrees, and Defendant does not seem to *seriously* contest, that the unfair competition claim is covered by the exception concerning "the use or retention of either party's intellectual property or confidential, proprietary, or sensitive information." *See, Dow Jones & Co., Inc. v. International Sec. Exch., Inc.*, 451 F.3d 295, 302 (2d Cir. 2006) ("In order to succeed on their misappropriation and unfair competition claims, plaintiffs must establish some wrongful appropriation or use of the plaintiffs' intellectual property.") (citations omitted); Lars S. Smith, *General Intangible or Commercial Tort: Moral Rights and State-Based*

*Intellectual Property as Collateral under U.C.C. Revised Article 9*, 22 Emory Bankr. Dev. J. 95, 101 (Fall 2005) ("'Intellectual Property' is a broad concept, often defined to include the following types of rights: patents, trademarks, copyrights, trade secrets, moral rights, rights of publicity, and rights against unfair competition. Thus, it is commonly accepted that the term 'intellectual property' includes more than just patents, trademarks, and copyrights.") (footnote omitted). And as mentioned above, Defendant concedes that the trademark infringement and dilution claims are excluded from the arbitration clause. Therefore, the first, sixth, seventh, eighth, and ninth causes of action are excepted from the arbitration clause, and Defendant's motion to dismiss them, pursuant to the arbitration clause, is denied.

However, the Court agrees with Defendant that some of Plaintiff's claims are subject to mandatory arbitration. Specifically, the second, third, fourth, and fifth causes of action are covered by the arbitration clause, and are not specifically excepted from such coverage. In that regard, the second-through-fifth causes of action pertain to the alleged conversion of demonstration equipment and supplies. These claims do not involve intellectual property. Nor do they concern "transactions involving the acquisition of products and/or services by Business Associate from Xerox." The phrase, "transactions involving the acquisition of products and/or services by Business Associate from Xerox," clearly envisions the type of commercial claim that is the subject of Plaintiff's first cause of action. It does not involve the type of situation presented in the second-through-fifth causes of action, wherein Defendant allegedly abused its position as an authorized dealer and service provider under the Agreement to steal products. Instead, and as Plaintiff noted in its June 26, 2008, termination notice, such

14

conduct would be a breach of Section 5.1 of the Amended Agreement involving unethical and dishonest acts. Accordingly, Defendant's motion to dismiss is granted as to the second, third, fourth, and fifth causes of action.

Defendant further maintains that it is entitled to recover its costs and expenses, including attorney's fees, incurred in defending claims that were covered by the arbitration clause. On this point, the Agreement states:

> If either party to this Agreement brings a lawsuit covering a dispute that is eventually determined to be a Covered Dispute as defined above, that lawsuit shall be barred as a result of the parties' selection of arbitration as the exclusive binding dispute-resolution mechanism for such claims. In such circumstances, the party that brought the lawsuit shall be required to reimburse the other party for all its costs and expenses (including its reasonable attorneys fees) associated with the defense of the lawsuit.

(Agreement § 7.3.2). Defendant seeks an award of attorney's fees and costs, pursuant to the Agreement. Essentially, Defendant maintains that Plaintiff breached the Agreement by including the second-through-fifth causes of action in this lawsuit. However, Defendant has no such claim pending before the Court. In that regard, Defendant filed the subject motion to dismiss in lieu of an answer, and consequently there is no counterclaim for attorney's fees and costs before the Court. Moreover, on the present record, it is unclear whether a claim for attorney's fees and costs under § 7.3.2 of the Agreement can be brought in this Court, or whether it must be made in an arbitration proceeding. Accordingly, Defendant's request for attorney's fees and costs is denied, without prejudice.

### _Personal Jurisdiction_

Defendant also maintains that it is not subject to personal jurisdiction in New York, since it never conducted business or committed a tortious injury here. Instead,

Defendant maintains that it dealt primarily, if not exclusively, with Plaintiff's representatives in the western United States, and that its business operations were limited to Arizona. Plaintiff, though, contends that Plaintiff is subject to specific jurisdiction under New York's "long-arm" statute, Civil Practice Law and Rules ("CPLR") sections 302(a)(1) and 302(a)(3), and further contends that the exercise of personal jurisdiction comports with Due Process. On this issue, Plaintiff maintains that Defendant knew it was dealing with a New York corporation, whose NAAO division was essentially controlled by decision makers in Rochester, and that Plaintiff "had direct or indirect communication with personnel in Xerox's Rochester office over a period of six years." (Pl. Memo of Law at 1). Plaintiff also maintains that Defendant's alleged tortious acts caused injury in New York.

In order to defeat a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) where, as here, the Court is relying solely upon pleadings and affidavits, a plaintiff need only make a *prima facie* showing of facts which establish the Court's jurisdiction over the defendant. *Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 364 (2d Cir. 1986); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) ("Prior to discovery, a plaintiff may defeat a [Rule 12(b)(2)] motion to dismiss based on legally sufficient allegations of jurisdiction.")(citations omitted), *cert. denied*, 519 U.S. 1006 (1996). All pleadings and affidavits must be viewed in the light most favorable to the plaintiff, and all doubts resolved in plaintiff's favor. *Cutco Industries, Inc.,* 806 F.2d at 365.

A federal court in a diversity action must look to the forum state's general

jurisdictional or long-arm jurisdictional statute to determine whether *in personam*

jurisdiction exists over a nonresident defendant. *See, Savin v. Ranier*, 898 F.2d 304,

306 (2d Cir.1990) (*citing Arrowsmith v. United Press Int'l*, 320 F.2d 219, 222-25 (2d

Cir.1963) (en banc)). If the relevant statute allows the court to exercise jurisdiction, the

court must then determine "whether the exercise of jurisdiction comports with due

process." *Id*. (citation omitted). In that regard,

> [t]he due process test for personal jurisdiction has two related
> components: the "minimum contacts" inquiry and the "reasonableness"
> inquiry. The court must first determine whether the defendant has
> sufficient contacts with the forum state to justify the court's exercise of
> personal jurisdiction. For purposes of this initial inquiry, a distinction is
> made between "specific" jurisdiction and "general" jurisdiction. Specific
> jurisdiction exists when "a State exercises personal jurisdiction over a
> defendant in a suit arising out of or related to the defendant's contacts
> with the forum"; a court's general jurisdiction, on the other hand, is based
> on the defendant's general business contacts with the forum state and
> permits a court to exercise its power in a case where the subject matter of
> the suit is unrelated to those contacts. Because general jurisdiction is not
> related to the events giving rise to the suit, courts impose a more stringent
> minimum contacts test, requiring the plaintiff to demonstrate the
> defendant's "continuous and systematic general business contacts."
>
> The second stage of the due process inquiry asks whether the assertion
> of personal jurisdiction comports with "traditional notions of fair play and
> substantial justice"--that is, whether it is reasonable under the
> circumstances of the particular case. The Supreme Court has held that
> the court must evaluate the following factors as part of this
> "reasonableness" analysis: (1) the burden that the exercise of jurisdiction
> will impose on the defendant; (2) the interests of the forum state in
> adjudicating the case; (3) the plaintiff's interest in obtaining convenient
> and effective relief; (4) the interstate judicial system's interest in obtaining
> the most efficient resolution of the controversy; and (5) the shared interest
> of the states in furthering substantive social policies. While the exercise
> of jurisdiction is favored where the plaintiff has made a threshold showing
> of minimum contacts at the first stage of the inquiry, it may be defeated
> where the defendant presents a compelling case that the presence of
> some other considerations would render jurisdiction unreasonable.

*Metro. Life Ins. Co.v. Robertson-Ceco Corp.*, 84 F.3d at 567-68.

In the instant case, the New York  jurisdictional statute upon which Plaintiff relies

is CPLR § 302, which provides, in relevant part:

> (a) Acts which are the basis of jurisdiction.  As to a cause of action arising
> from any of the acts enumerated in this section, a court may exercise
> personal jurisdiction over any non-domiciliary, or his executor or
> administrator, who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply
> goods or services in the state; or
>
> ***
>
> 3. commits a tortious act without the state causing injury to person or
> property within the state, except as to a cause of action for defamation of
> character arising from the act, if he
>
> (i) regularly does or solicits business, or engages in any other persistent
> course of conduct, or derives substantial revenue from goods used or
> consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in
> the state and derives substantial revenue from interstate or international
> commerce;

New York Civil Practice Law & Rules  § 302 (McKinney's 2009).  The test for

determining whether or not the "transacts business" prong of CPLR § 302(a)(1) is

satisfied has been set forth by the Second Circuit Court of Appeals as follows:

> The long-arm statute gives New York personal jurisdiction over a
> nondomiciliary if two conditions are met: first, the nondomiciliary must
> 'transact business' within the state; second, the claim against the
> nondomiciliary must arise out of that business activity.  A nondomiciliary
> 'transacts business' under CPLR 302(a)(1) when he 'purposefully avails
> [himself] of the privilege of conducting activities within [New York], thus
> invoking the benefits and protections of its law.  No single event or contact
> connecting defendant to the forum state need be demonstrated; rather,
> the totality of all defendant's contacts with the forum state must indicate
> that the exercise of jurisdiction would be proper.

*Cutco Indus., Inc.*, 806 F.2d at 365 (citations omitted).  The Second Circuit has further

held that,

> [s]everal factors should be considered in determining whether an
> out-of-state defendant transacts business in New York, including:
>
>> (i) whether the defendant has an on-going contractual
>> relationship with a New York corporation; (ii) whether the
>> contract was negotiated or executed in New York and
>> whether, after executing a contract with a New York
>> business, the defendant has visited New York for the
>> purpose of meeting with parties to the contract regarding the
>> relationship; (iii) what the choice-of-law clause is in any such
>> contract; and (iv) whether the contract requires franchisees
>> to send notices and payments into the forum state or
>> subjects them to supervision by the corporation in the forum
>> state.
>
> *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29
> (2d Cir.1996) (internal citations omitted). Although all factors are relevant,
> no one factor is dispositive and other factors may be considered. *See id.*
> "[T]he ultimate determination is based on the totality of the
> circumstances." *Id.*

*Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 22 -23 (2d Cir. 2004). As for the

requirement, under 302(a)(1), that the claim arise out of the business transacted in New

York, the Second Circuit has held that "[a] claim arises out of a defendant's transaction

of business in New York when there exists a substantial nexus between the business

transacted and the cause of action sued upon." *Agency Rent A Car System, Inc. v.

Grand Rent A Car Corp.*, 98 F.3d at 31 (citations omitted).

Applying the *Agency Rent A Car* factors, the Court finds, first, that Defendant

clearly had an on-going contractual relationship with a New York corporation. Second,

Defendant did not negotiate or execute a contract in New York, and did not visit New

York in connection with the contract.[6]  The Court observes, though, that the Second

Circuit has questioned the importance of this factor. *See, Agency Rent A Car Sys., Inc.*

*v. Grand Rent A Car Corp.*, 98 F.3d at 30 ("[W]e question whether, in an age of e-mail

and teleconferencing, the absence of actual personal visits to the forum is any longer of

critical consequence.") (citation omitted).  Third, the Agreement contained a New York

choice-of-law provision, which is "a significant factor in a personal jurisdiction analysis

because the parties, by so choosing, invoke the benefits and protections of New York

law." *Sunward Elec., Inc. v. McDonald*, 362 F.3d at 23 (citations omitted).  As for the

fourth *Agency Rent A Car* factor, the Agreement subjected Defendant to supervision by

Plaintiff in New York, even though Defendant's direct contacts were usually with

Plaintiff's field representatives in other states.[7]  Considering all of the foregoing factors

and the totality of the circumstances, the Court finds that Defendant "transacted

business" in New York within the meaning of CPLR § 302(a)(1).  Further, the Court

finds that Plaintiff's claims arise out such business, since there is a substantial nexus

between the business and the claims.  Having found that Defendant is subject to

personal jurisdiction under CPLR § 302(a)(1), the Court need not consider whether

Defendant is also subject to jurisdiction under CPLR § 302(a)(3).

Moreover, the Court finds, upon application of the factors discussed above, that

---

[6]Plaintiff argues that the second *Agency Rent A Car* factor favors the exercise of jurisdiction, since the Agreement was drafted and approved *by Plaintiff* in New York.   However, "[w]hen considering a defendant's contacts with a forum, its actions rather than the plaintiff's naturally have more jurisdictional import." *Viacom Int'l, Inc. v. Kearney*, No. 98 CIV. 6226(SAS), 1999 WL 92601 at *3 (S.D.N.Y. Feb. 22, 1999).

[7]*See*, Eychner Affidavit (Docket No. [#11].  The Eychner affidavit states that Defendant was subject to ongoing supervision by NAAO personnel in Rochester, and the Court is required to view the evidence in the light most-favorable to Plaintiff.

the exercise of personal jurisdiction over Defendant satisfies the Due Process Clause of the U.S. Constitution.  In that regard, Defendant deliberately entered into a long-term contractual relationship with a New York corporation, through a contract containing a New York choice-of-law provision.  Defendant therefore availed itself of the New York forum and could have reasonably foreseen being haled into court here. *See, Sunward Elec., Inc. v. McDonald*, 362 F.3d at 24 ("The exercise of personal jurisdiction here comports with 'traditional notions of fair play and substantial justice,' because Defendants' contacts with New York were continuous and substantial, and in no way random, fortuitous or attenuated.") (citations and internal quotation marks omitted).[8] For all of the foregoing reasons, Defendant's motion to dismiss for lack of personal jurisdiction is denied.

*Improper Venue*

Defendant further contends that this case is not properly venued in the Western District of New York, since Defendant does not reside here, and since a substantial part of the events or omissions giving rise to Plaintiff's claims did not occur here.  Plaintiff, in its responsive memorandum, maintained that a substantial part of the events giving rise to the claims occurred here.  As to this contention, Plaintiff deviated from its Complaint, which, as discussed above, alleged that venue in the Western District of New York was appropriate since Defendant was subject to personal jurisdiction here.  However, then

---

[8]Defendant, citing *Omni Consulting Group, Inc. v. Marina Consulting, Inc.*, No. 01 CV 0511, 2004 WL 1946456 (W.D.N.Y. Aug. 31, 2004), contends, though, that the exercise of personal jurisdiction would be unreasonable, and violate due process, since it does not have "vast resources" or "demonstrated business ties to New York." (Def. Reply Memo at 5).  The *Omni Consulting* case is factually inapposite, and involved an analysis of New York's general jurisdiction statute, CPLR § 301.  Moreover, a defendant need not have vast resources in order for the exercise of personal jurisdiction to satisfy due process.

at oral argument, Plaintiff's counsel further maintained that venue is appropriate here, under 28 U.S.C. § 1391(c), since Defendant is a corporation that is subject to personal jurisdiction in this district.  The relevant venue status is 28 U.S.C. § 1391, which states, in relevant part:

> (b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in
>
> ***
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]
>
> ***
>
> (c) For purposes of venue under this chapter, *a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced*. In a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

28 U.S.C. § 1391 (West 2009) (emphasis added).

FRCP 12(b)(3) provides for dismissal of claims due to "improper venue."  The burden is on the plaintiff to establish that venue is correct.  However, where, as here, a court is asked to resolve a 12(b)(3) motion based upon pleadings and affidavits, "to avoid dismissal "the plaintiff need only make a prima facie showing of venue." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (citation and internal quotation marks omitted).  Moreover, a court "analyzing whether the plaintiff has made the requisite prima facie showing that venue is proper, [must] view all the facts in a light most favorable to plaintiff." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir.

2007) (citation omitted).  If the plaintiff cannot establish that the chosen venue is correct, "[t]he district court . . . shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C.A. § 1406.  When applying FRCP 12(b)(3) and 28 U.S.C. § 1406(a), "[t]he threshold inquiry . . . is for the Court to determine whether the case is indeed in the "wrong" district, as that phrase is used in the statute." *SST Global Tech., LLC v. Chapman,* 270 F.Supp.2d 444, 452 (S.D.N.Y. 2003).

Applying these applicable legal principles, the Court finds that venue in the Western District of New York is proper under 28 U.S.C. § 1391(c) since, as discussed above, Defendant is a corporation that was subject to personal jurisdiction in this district when the action was commenced.  Accordingly, Defendant's motion to dismiss for improper venue is denied.

### *Transfer of Venue*

Defendant alternatively contends that the Court should transfer venue to the District of Arizona, "for the convenience of the parties and witnesses and in the interest of justice." (Def. Memo of Law [#4-9] at 11).  Defendant argues that the District of Arizona is a more-convenient forum, for the following reasons: 1) both Plaintiff and Defendant maintain business operations in Arizona; 2) most of Defendant's witnesses are located in Arizona, and some of Plaintiff's anticipated witnesses are located in California; 3) litigating in New York will impose a financial hardship on Defendant, while litigating in Arizona would impose no such hardship on Plaintiff; 4) the locus of operative facts is Arizona; and 5) Plaintiff's choice of venue should be given little weight, since this lawsuit has little connection to New York.  Plaintiff, on the other hand, maintains

that Defendant has failed to make a strong showing in favor of transferring venue. In that regard, Plaintiff states that: 1) Plaintiff's choice of forum is entitled to deference; 2) many of Plaintiff's witnesses are located in Rochester; 3) the majority of Plaintiff's relevant documents are located in Rochester; 4) this Court is best able to apply New York law; and 5) although Plaintiff has significant resources, such resources would "quickly be drained if Xerox were constantly [being] required to litigate in remote, inconvenient locations." (Pl. Memo of Law at 19).

The legal standards applicable to an application to transfer venue are clear. 28 U.S.C. § 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." With respect to such an application,

> [i]n order to transfer a civil action under section 1404(a), the moving party must satisfy two requirements. First, the transferee court must be able to exercise jurisdiction over the parties and must be an appropriate venue for the action. Second, the balance of convenience and justice must favor transfer. Although the first requirement is straightforward, the second requirement is essentially an equitable task left to the Court's discretion.
>
> Relevant factors include the: (1) deference accorded to plaintiff's choice of forum; (2) convenience to witnesses and parties; (3) situs of operative facts; (4) interests of justice and judicial economy; (5) relative ease of access to sources of proof; (6) availability of process to compel unwilling witnesses; (7) relative means of the parties; and (8) forum's familiarity with the governing law.
>
> When conducting this balancing test, the court enjoys broad discretion and decides based on notions of convenience and fairness on a case-by-case basis. The movant bears the burden of showing that transfer is warranted.
>
> Not all of the above factors merit equal weight. When plaintiff does not reside in and the operative facts bear little connection to the forum district, plaintiff's choice is shown less deference.
>
> ***

The convenience of witnesses is the most important factor in deciding whether to transfer an action, although the court does not generally consider witnesses located outside both the current and transferee districts. The location of documents, on the other hand, is not a compelling consideration when records are easily portable. For the purpose of determining the "situs of operative facts," a court may make reasonable assumptions regarding the location of events if they are not clearly specified in the complaint.

*Harrison v. Samuel*, No. 05 Civ. 8914(SAS), 2006 WL 1716867 at *2 (S.D.N.Y. Jun. 20, 2006) (Citations and internal quotation marks omitted).

Applying the foregoing factors, the Court finds, first, that Plaintiff's choice of forum is entitled to deference, since Plaintiff resides in this district. Therefore, that factor weighs in Plaintiff's favor. Second, it appears that the convenience of parties is a neutral factor, since one party's witnesses will be inconvenienced regardless of which forum is chosen. Third, it appears likely that the situs of operative facts favors the Arizona forum, since that is where the alleged breaches and intellectual property violations occurred. Therefore, that factor favors Defendant. The next several factors, namely, the interests of justice and judicial economy, the relative ease of access to sources of proof, and the availability of process to compel unwilling witnesses, favor Defendant. In that regard, the Court finds that it would impose a greater hardship on Defendant's witnesses to travel to New York that it would for Plaintiff's witnesses, most of whom are corporate employees, to travel to Arizona. As for the relative means of the parties, this factor favors Defendant, since Plaintiff clearly has superior financial resources. Lastly, this Court is presumably more familiar with New York State law, which slightly favors Plaintiff's choice of forum.

In short, the most significant factor favoring transfer is the disparity between the

relative means of the parties, although some courts have held that this factor is less important where, as here, both parties are corporations. *See, Ripmax Ltd. v. Horizon Hobby, Inc.*, No. 3:07-CV-386 (JCH), 2007 WL 2049033 at *5 (D.Conn. Jun. 25, 2007) ("[T]he relative means of the parties is entitled to little weight where both parties are corporations.") (citation omitted); *but see, USA Interactive v. Savannah Air Ctr., LLC*, No. 02 Civ. 3659(LLS), 2002 WL 1808236 at *2 (S.D.N.Y. Aug. 7, 2002) ("Although the relative means of the parties is a more significant factor when one party is an individual, the fact that there is a disparity between the relative means of the two corporations supports a transfer.") (citation and internal quotation marks omitted).

Having considered all of the applicable factors and the facts and circumstances of this case, the Court finds that the case should be transferred to Arizona. In that regard, there is a vast disparity in the financial resources of the parties, which favors transferring the case. Moreover, litigating in New York would likely be highly disruptive to Defendant's business, which consists of seven employees, two of whom account for almost all of Defendant's sales. On the other hand, litigating this action in Arizona is unlikely to have any significant impact on Plaintiff's overall operations. Accordingly, Defendant's application to transfer venue is granted.

CONCLUSION

For the reasons discussed above, Defendant's motion [#4] is granted in part and denied in part, as follows: 1) Plaintiff's second, third, fourth, and fifth causes of action are dismissed, pursuant to the Agreement's arbitration clause; 2) Defendant's request for costs and attorney's fees is denied; 3) Defendant's application to dismiss for lack of personal jurisdiction and improper venue is denied; 4) Defendant's motion to transfer

26

venue is granted, and this action is transferred to the United States District Court for the District of Arizona.

        SO ORDERED.

Dated:        September 14, 2009
               Rochester, New York

                                 ENTER:


                                /s/ Charles J. Siragusa
                               CHARLES J. SIRAGUSA
                               United States District Judge